**Ex parte Thomas Smith MATHES, III.**

**No. 09–87–140 CR.**

Court of Appeals of Texas,
Beaumont.

May 25, 1988.

Discretionary Review Granted Oct. 5, 1988.

William E. Hall, Jr., Conroe, for appellant.

Peter Speers, III, Dist. Atty. and Thomas D. Glenn, Asst. Dist. Atty., Conroe, for appellee.

## OPINION

BURGESS, Justice.

Relator was charged by separate indictments with the capital murders of two individuals. Both the murders arose during the same robbery. In 1986, relator was found guilty of the capital murder of the first victim. During the punishment phase, the jury answered "no" to the special issue: "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *TEX.CODE CRIM. PROC.ANN. art. 37.071(b)(2)* (Vernon Supp.1988). Because of this finding, relator was sentenced to confinement for life.[1] After relator's conviction, the state announced its intention to try relator for the capital murder of the second victim and to seek the death penalty once again. Relator filed an application for writ of habeas corpus with the trial court. The writ was denied. Relator then timely perfected appeal to this court.[2] Relator does not challenge the state's authority to try him for the capital murder of the second victim. The issue before this court is whether the prosecution's failure to prove its case for the death penalty in the first trial was an "acquittal" of that penalty so as to bar the prosecution from seeking the death penalty in relator's trial for the second capital murder.

1. "If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on or is unable to answer any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life." *TEX.CODE CRIM.PROC.ANN. art. 37.071(e)* (Vernon Supp.1988).

2. Writ of habeas corpus is an appropriate remedy to review relator's double jeopardy claim; the double jeopardy clause, U.S. CONST. amend. V, protects individuals from being tried twice for the same offense, not merely from being twice convicted. *Ex parte Robinson,* 641 S.W.2d 552, 554 (Tex.Crim.App.1982); *Ex parte Rathmell,* 717 S.W.2d 33, 34 (Tex.Crim.App.1986).

Generally, the imposition of a particular sentence is not regarded as an "acquittal" of more severe sentences that could have been imposed. This is because in the usual sentencing proceeding it is impossible to conclude that a sentence less than the statutory maximum constitutes a decision that the government has failed to prove its case. *See Bullington v. Missouri,* 451 U.S. 430, 438 & 443, 101 S.Ct. 1852, 1857 & 1860, 68 L.Ed.2d 270, 278 & 282 (1981). The Supreme Court has carved an exception to this general principle, however. In *Bullington,* the defendant was being retried for the same offense after his first conviction was reversed due to error in the guilt phase. The Supreme Court held that the double jeopardy clause of the fifth amendment[3] barred the state from seeking the death penalty at the retrial of the defendant whose first jury, following a capital sentencing proceeding which effectively amounted to a trial on the issue of punishment, declined to impose the death penalty.[4] The Court reasoned that when a state enacts a capital sentencing procedure that resembles a trial on the issue of guilt or innocence, the state explicitly requires the jury to determine whether the prosecution had "proved its case." 451 U.S. at 443, 444, 101 S.Ct. at 1860, 1861, 68 L.Ed.2d at 282. A refusal on the part of the jury to impose the death penalty then constitutes the equivalent of an "acquittal" of the death penalty for the crime charged. *See Arizona v. Rumsey,* 467 U.S. 203, 212, 104 S.Ct. 2305, 2310, 81 L.Ed.2d 164, 172 (1984) (applying *Bullington*). The double jeopardy clause forbids the retrial of a defendant who has been acquitted of the crime charged. *United States v. DiFrancesco,* 449 U.S. 117, 129, 101 S.Ct. 426, 433, 66 L.Ed.2d 328, 341 (1980); *Burks v. United*

*States,* 437 U.S. 1, 7, 98 S.Ct. 2141, 2145, 57 L.Ed.2d 1, 7 (1978); *Green v. United States,* 355 U.S. 184, 188, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199, 204 (1957).

The relator in this case is not being retried for the same murder, as was the defendant in *Bullington;* he is being tried for another murder arising from the same transaction from which a murder for which he has already been convicted arose. Relator argues *Bullington* should be extended to hold that the double jeopardy clause bars the state from seeking the death penalty at his capital trial for the second murder.

In *Padgett v. State,* 717 S.W.2d 55 (Tex. Crim.App.1986), the Texas Court of Criminal Appeals was also called upon to consider whether *Bullington* should be extended to bar the state from seeking the death penalty a second time where the defendant was to be tried for the murder of a second victim arising out of the same transaction as the first. However, in *Padgett,* the jury in the first trial was unable to answer the continuing threat special issue, whereas in the instant case, the jury in the first trial answered the special issue in the negative. The court in *Padgett* inquired into whether the doctrine of collateral estoppel embodied within the double jeopardy clause, *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469, 476 (1970), would preclude relitigation of the death penalty issue in that case. Stated simply, collateral estoppel means when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. 397 U.S. at 443, 90 S.Ct. at

**3.** The double jeopardy clause of the fifth amendment, applicable to the states via the fourteenth amendment, *Benton v. Maryland,* 395 U.S. 784, 793, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707, 716 (1969), provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

**4.** The Texas Court of Criminal Appeals ruled that under *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) and *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), when a jury's answer to the continuing

threat issue had been set aside due to insufficiency of the evidence, the state could not seek the death penalty upon retrial, *Brasfield v. State,* 600 S.W.2d 288, 298 (Tex.Crim.App.1980), nor could the penalty be sought in a retrial granted because of trial error in the guilt phase, when the defendant had received a favorable verdict on the continuing threat issue in his first trial. *Sanne v. State,* 609 S.W.2d 762 (Tex.Crim.App. 1980), *cert. denied,* 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 432 (1981).

1194, 25 L.Ed.2d at 475. The court of criminal appeals said in *Padgett*:

> Presuming that the Fifth Amendment requires that the doctrine of collateral estoppel be applied to the punishment phases of different capital murder trials, we must now determine whether the jury actually decided Special Issue No. 2 in appellant's first capital murder trial. If it did, then the State would be collaterally estopped from relitigating the issue, thus preventing it from seeking the death penalty in the instant case.

717 S.W.2d at 57 (footnote omitted). In footnote six, *id.*, the court noted,

> In *Ashe*, supra, the Supreme Court applied the doctrine of collateral estoppel to the *guilt/innocence phases* of two different trials.... We need not decide whether [*Rumsey* and *Bullington*, and *Sanne v. State*, 609 S.W.2d 762, 767 (Tex.Crim.App.1980)] require the application of collateral estoppel to the punishment phases of different cases because the instant case does not even involve a fact issue that has been sufficiently resolved to invoke that doctrine.

The *Padgett* court concluded that in the defendant's trial for the capital murder of the first victim, the jury's inability to answer the continuing threat special issue was not an actual determination of the issue. "Without such a determination, the State is not collaterally estopped from relitigating that issue by trying relator for the capital murder of [the second victim]. Therefore, the State is not estopped from seeking the death penalty in that cause." *Id.* at 58.

The court of criminal appeals has held that collateral estoppel applies to sentencing hearings. *Ex parte Augusta*, 639 S.W.2d 481, 485 (Tex.Crim.App.1982); *Cooper v. State*, 631 S.W.2d 508, 513 (Tex.Crim.App. 1982). *See also Ex parte Tarver*, 695 S.W. 2d 344, 349 (Tex.App.—Houston [1st Dist.] 1985), *aff'd*, 725 S.W.2d 195 (Tex.Crim.App. 1986) (probation revocation hearings). What remains for determination is the question left unresolved by the court of criminal appeals in *Padgett*, whether the fifth amendment requires the doctrine of collateral estoppel to be applied to the punishment phases of different capital murder trials.

In *Ashe*, six men in a poker game were robbed by several masked gunmen. Defendant was tried for the robbery of one of the players, the only real issue in that trial being identity. After his acquittal, the defendant was tried and convicted for the robbery of another of the players. The Supreme Court held that the doctrine of collateral estoppel, embodied within the fifth amendment guarantee against double jeopardy, barred the defendant's trial for the robbery of the second victim, saying:

> The question is not whether Missouri could validly charge the petitioner with six separate offenses for the robbery of the six poker players.... It is simply whether, after a jury determined by its verdict that the petitioner was not one of the robbers, the State could constitutionally hale him before a new jury to litigate that issue again.
>
> ... Once a jury had determined upon conflicting testimony that there was at least a reasonable doubt that the petitioner was one of the robbers, the State could not present the same or different identification evidence in a second prosecution for the robbery of [the first player] in the hope that a different jury might find that evidence more convincing. The situation is constitutionally no different here, even though the second trial related to another victim of the same robbery. For the name of the victim, in the circumstances of this case, had no bearing whatever upon the issue of whether the petitioner was one of the robbers.

*Ashe*, 397 U.S. at 446, 90 S.Ct. at 1195, 25 L.Ed.2d at 477. As in *Ashe*, the state in this case seeks to relitigate an issue which has been decided against it in a trial on another case arising from the same transaction.

██ Upon hearing relator's petition for writ of habeas corpus in this case, the trial court found that the evidence to be presented by the state would be "virtually identical" to the evidence presented in the de-

fendant's first trial. The court's decision in *Ashe* hinged upon the logic that since the robbers of both victims were the same and the defendant was not one of the robbers of the first victim, he could not have been a robber of the second; therefore, the issue of identity had been established finally in the first trial. Relator's case hinges upon the logic that since the relator was not a "continuing threat" at the close of the first trial (per the jury's finding on the second special issue) and the state has stipulated the evidence in this proposed second trial will be "exactly the same," he cannot now be said to be a continuing threat; therefore, the continuing threat issue was established finally in the first trial. We find this logic persuasive.

We are not persuaded by the reasoning given by the trial judge when he concluded that because the state's evidence can be interpreted to show relator's role in causing the death of the second victim was "qualitatively different" from his role in causing the death of the first, the "no" answer to the continuing threat special issue in the first case does not collaterally estop the state from seeking the death penalty in the second. The special issue is not submitted to the jury with the restriction that they consider' the issue "as it pertains to this victim." Instead, the issue asks the jury to determine generally whether the defendant will be a continuing threat to society. During presentation of its case in a capital sentencing proceeding, the prosecution may present evidence as to any matter the court deems relevant to sentencing. *TEX.CODE CRIM.PROC. ANN. Art. 37.071(a)* (Vernon Supp.1988). The state was free in the first sentencing proceeding to present evidence of whatever facts made the relator's role in causing the death of the second victim "qualitatively different." To hold that the state is now free to relitigate the continuing threat issue would be to allow the state to refine and strengthen its case on the issue, turning the first trial into a dry run. Such refinement is "precisely what the constitutional guarantee forbids." *Ashe,* 397 U.S. at 446, 90 S.Ct. at 1195, 25 L.Ed.2d at 477. We hold then, under *Bullington* and *Ashe,*

that the jury's negative determination of the continuing threat issue in relator's first trial collaterally estops the state from relitigating the issue in relator's upcoming trial. Given the conjunctive nature of the three capital murder special issues, our holding necessarily bars the state from again seeking the death penalty in relator's upcoming capital murder trial. Relator's second point of error is sustained. This ruling makes it unnecessary to reach relator's points of error asserting bar under double jeopardy generally and res judicata. The order denying habeas corpus relief is overruled. The writ shall issue.

WRIT GRANTED.

BROOKSHIRE, Justice, dissenting.

The Appellant, Mathes, was indicted by two separate indictments. In the first capital murder indictment, the allegations were that Mathes, in the course of committing, and attempting to commit, robbery of John Vandiver and Debra Davis, intentionally caused the death of Vandiver *by shooting him with a firearm.* The other, second indictment alleged that Mathes, in the course of committing, and attempting to commit, robbery of Vandiver and Davis, intentionally caused the death of Davis *by shooting her with a firearm and cutting her with a knife.* Mathes was convicted of capital murder of Debra Davis and is presently serving a life sentence in No. 18,557. The jury was asked:

"[W]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

The jury answered: "No." *TEX.CODE CRIM.PROC.ANN. Art. 37.071(b)(2)* (Vernon Supp.1988); *TEX.CODE CRIM.PROC. ANN. Art. 37.071(e)* (Vernon Supp.1988).

Mathes argues, under the doctrine of "collateral estoppel," that he cannot be tried again on the charge of capital murder. The majority agrees with this argument to a large extent.

The vehicle chosen by the Appellant, who is actually a Relator, is his petition for writ

of habeas corpus. A brief recitation of the doctrine of collateral estoppel is:

"It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit...."

*Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475 (1970).

To test whether the prosecuting authority, such as the State here, is collaterally estopped on such an issue as is before us, in a criminal proceeding, the Supreme Court has delineated the following guidelines, in *Ashe v. Swenson*, 397 U.S. at 444, 90 S.Ct. at 1194, 25 L.Ed.2d at 475–476, stating:

" '[E]xamine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The *inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' ...*" (Emphasis added)

The State's evidence in the second capital murder case could, and reasonably would, be properly susceptible to a different qualitative interpretation concerning the role that the Appellant/Relator played in causing the death of John Vandiver. Mathes has not been tried for the alleged capital murder of Vandiver. For cogent reasons, the "no" answer to Special Issue No. 2 returned by the jury in cause No. 18,557 does not collaterally estop the State from prosecuting the Appellant for capital murder and seeking the death penalty. The Appellant/Relator's acts, motives, state of mind, intent, demeanor and degree of malice in causing the death of John Vandiver could be, and in my opinion is, qualitatively different and meaningfully distinguishable. The doctrine of collateral estoppel, under the records before us, is not applicable.

I have been shown no provision in the Code of Criminal Procedure which would permit the trial court, in a capital murder case, to fail to submit both special issues,

as dictated by the statutes, to the jury. *Article 37.071* gives the trial judge no leeway in submitting the special issues.

The clear language of *TEX.PENAL CODE ANN. Sec. 19.02(a)(1)* (Vernon 1974) and the wording of *TEX.PENAL CODE ANN. Sec. 1903(a)(2)* (Vernon 1974), mandatorily sets forth that the Legislature has determined that the offense of capital murder, as defined in *Sec. 19.03(a)(2) is completed with the death of a single individual.*

Neither the federal constitution, the Texas state constitution nor Texas statutes, prohibit multiple prosecutions for two statutory offenses, even though the two offenses may have been considered as having been committed in the same transaction, criminal episode or robbery. The constitutional provisions speak of double jeopardy in terms of being tried twice for the "same offense". These constitutional provisions do not speak of double jeopardy in the terms of the "same transaction" or "same criminal episode" or "same robbery". The Supreme Court of the United States in *Sanabria v. United States*, 437 U.S. 54, 69, 98 S.Ct. 2170, 2181, 57 L.Ed.2d 43, 57 (1978), stated that the power to define "offenses" lies in the legislative branch of government.

"But once Congress has defined a statutory offense by its prescription of the 'allowable unit of prosecution,' ... that prescription determines the scope of protection afforded by a prior conviction or acquittal."

When the Legislature defined certain criminal offenses, it thereby demonstrated its intent to allow prosecutions for each offense, although it might be argued that the separate offenses occurred within one criminal transaction, episode or robbery. The prohibitions against being twice put into jeopardy for the same offense logically leads to a definition of the "same offense." In *Ex Parte McWilliams*, 634 S.W.2d 815, 824 (Tex.Crim.App.1982, on Rehearing), it is stated:

"The Supreme Court of the United States has provided such a test: '[T]he applicable rule is that where the same act or

transaction constitutes a violation of two distinct statutory provisions the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ... The *Blockburger* test is satisfied if each statutory offense requires the proof of a fact that the other does not. . . .''

In our case, subjudice, proving the death of John Vandiver would be an additional proof of an essential fact that would not necessarily had to have been demonstrated in the capital murder case involving the death of Debra Davis. In one case, Texas must prove the death of Debra Davis—in the other case, the death of John Vandiver. Hence, one case requires proof of an essential fact which the other, second case does not. It is the separate elements of each offense which must be carefully analyzed in applying the *Blockburger* test. *See Brown v. Alabama,* 619 F.2d 376 (5th Cir. 1980). Two separate individual human beings were killed and murdered at two separate times—hence, two separate offenses.

Furthermore, in *Ex Parte Rathmell,* 717 S.W.2d 33 (Tex.Crim.App.1986), the Court of Criminal Appeals agreed with the rationale of the Supreme Court of Tennessee in a case styled *State v. Irvin,* 603 S.W.2d 121 (Tenn.1980). The Court of Criminal Appeals held that the applicant had violated the involuntary manslaughter statute, being *TEX.PENAL CODE ANN. Sec. 19.-05(a)(2)* (Vernon Supp.1988), twice for the reason that he had caused the death of two individuals. Hence, the applicant's pretrial habeas corpus petition was denied. The court found that two distinct and two separate criminal offenses had been committed and that, therefore, the trial of the applicant for the death of the second individual was not disallowed by the prohibition against double jeopardy. Here, our Appellant has violated the capital murder statute, *TEX.PENAL CODE ANN. Sec. 19.-03(a)(2)* (Vernon 1974), twice by causing the deaths of two individuals, thereby committing two distinct and separate criminal offenses.

Indeed, in *Ex Parte Rathmell,* 717 S.W. 2d at 35, the court extended the *Blockburger/McWilliams* rationale, which applies to situations in which the criminal conduct violates a distinct statute two times, involving the death of two different human beings. Then, each individual death constitutes a complete, distinct and separate criminal offense under the provisions of the statute. Hence, each death constitutes a separate "allowable unit of prosecution." *Sanabria v. United States,* 437 U.S. 69, 98 S.Ct. 2181, 57 L.Ed.2d at 57. And, of course, the Court of Criminal Appeals, in *Ex Parte McWilliams,* 634 S.W.2d at 823, clearly stated:

"The constitutional provisions speak of double jeopardy in terms of the 'same offense' rather than 'same transaction' . . ."

The Tennessee Supreme Court, in *State v. Irvin,* 603 S.W.2d 121, 123 (Tenn.1980), succinctly wrote:

"It seems illogical to us, as a general proposition, to hold that when two persons have been killed by an accused, he has committed only one homicide. . . ."

The second murder was a separate and distinct offense.

In the original or first proceeding the Relator, Thomas Smith Mathes, III, was charged with the offense of capital murder of Debra Davis.

A considerable amount of time has passed since the Relator Mathes was tried for the capital murder of Debra Davis, and nothing has been shown to our court of his acts or demeanor that have transpired during this extended period of time. Relator Mathes is yet to be tried for the capital murder of John Vandiver.

The State's theory in general is that the Relator Mathes' actions and course of conduct was qualitatively and meaningfully different in relation to the taking of the life of Debra Davis as distinguished from the taking of the life of John Vandiver. There can be no doubt that awesome and horrendous brutality took place at the residence of John and Debra on the evening or night in question. Upon autopsy it was proved

that the nature of the wounds to John Vandiver were gruesome. Vandiver having suffered two gunshot wounds to the back and two to the head, his death resulted.

Mathes outlined to the others what they were going to do on the evening in question, being on or about February 21, 1985. The State's theory, in part, is that the four involved had been ingesting marijuana and some cocaine throughout the day and actually ingested more cocaine on the way to the house of John and Debra. When they arrived at that house, Mathes got out. He was armed with a .38 caliber revolver; he went into the house by himself. The three other actors, Dennis Holland, Cecil Covington, Jr., and Joe Makosky remained hidden in the van. Two gunshot sounds came from within the house and Dennis Holland stated that when he came in the front door of the house he saw Thomas Mathes with a .38 in his hand. He also saw John Vandiver obviously shot and injured, lying face down on the floor of the living room, begging and pleading for his (Vandiver's) life. Mathes continued to demand to know where the money was kept. The basic plan from the beginning was to rob and kill Vandiver. The planner was Mathes. Finally, Vandiver told where the money was, being in a bedroom and wrapped in Christmas wrappings. Vandiver made some sort of statement like; take anything you want, still pleading with Mathes not to shoot him (Vandiver) again.

The robbery apparently netted about $40,000 in cash from Vandiver's house. Thomas Mathes had stated at a prior time that he, Mathes, was going to rob and kill John Vandiver. Prior to approaching Vandiver's house, Mathes had stated, according to the State's theory, that he, Mathes, would go in and shoot Vandiver in the back. Basically, a plan was gone over in the motel room before the group started their journey to Vandiver's house. Apparently, in the motel room, Thomas Mathes told Cecil and the others that he, Thomas, was going to shoot John in the back because Vandiver had a serious back problem and Mathes knew about it. The drive from

the motel to Vandiver's residence took about forty-five minutes.

It certainly is plausible that Mathes' state of mind, his plans and intent were qualitatively different in regard to John Vandiver. Therefore, in my opinion, it seems that this court's decision and holding are overbroad. Again, Mathes went into the house first, alone, leaving Cecil and the other two lying down in the van. The first shots were fired and heard, then the other three, Covington, Holland and Makosky, crawled out of the van and ran in the front door. It was at that point that Dennis Holland saw Tom pointing his gun at Vandiver.

According to Holland, when he first saw Vandiver, he described Vandiver's size as a pretty big man. Vandiver had blood on his back and Vandiver was calling Mathes a "son-of-a-bitch", which, under the record does not appear to be a total obscenity. Mathes then looked through some drawers in an attempt to find money. Then, according to one version, Thomas came out of a bedroom and walked over to Vandiver. Thomas still had the .38 in his hand and he asked Vandiver where he had all of his money hidden. It was at this point that Vandiver told Thomas that the money was wrapped up in a Christmas package. After Vandiver said just don't shoot me no more, or something like that, Mathes walked over to Cecil Covington, Jr., and handed Cecil the .38. To satisfy Mathes, Cecil fired two shots at Vandiver.

When Thomas came out of the house, he had a quantity of marijuana and Cecil carried out a Christmas package full of money. Mathes drove the van away. During the drive away from Vandiver's house, Thomas asked Cecil how much money was in the package. The package was opened up; it was too dark to accurately count. Cecil seemed to think that there would be about $70,000. Tom said something like, well we could count it back at the motel. Thomas obviously was the ringleader and could be described as the planner or mastermind of these dastardly deeds of murder. It is plausible that the State can offer cogent evidence that Thomas Mathes, III,

from the very first, planned to rob and kill Vandiver but not *necessarily* either to rob or murder Debra Davis.

Cecil was shown to have acted as Tom's bodyguard and was constantly under his command or direction. Cecil did not question Tom's commands. In turn, Holland was a number one, or lead student, under Cecil Covington, Jr., for the purpose of taking various levels of belts of karate training.

Thomas Mathes was described as a "bigshot" and "handled" people around him, including Cecil and Holland. Holland described Cecil Covington, Jr., as a Sensi, being an instructor in a type of karate. Under karate rituals, Cecil was equivalent to an absolute master. There exists a special bond between the Sensi and his number one student; that is, between Cecil Covington, Jr., and Holland. The student owes unquestionable loyalty to the Sensi. Holland testified that he was Cecil's No. 1 disciple and that Holland lived with Cecil. Holland unequivocally testified that anything that Cecil asked or told him to do, Holland would do it without a question. This was common practice or custom for the style of karate that Holland was being trained in, known as Shorin–Ryu. Shorin–Ryu form of karate was described as the hardest of the three forms which required the most dedication and it was the deadliest form of karate.

Mathes let Vandiver suffer, Mathes would not deliver the coup de grace. Vandiver suffered horribly for quite awhile before he was dispatched by Holland at the instruction of either Cecil or Tom and Cecil.

Debra Davis' actual death was brought about, it appears, by being attacked repeatedly with a Samurai sword wielded by Makosky.

The application of collateral estoppel must be based on a final judgment. This is a correct concept because the doctrine is based on *preserving the finality of judgments*. In our case there is no final judgment. We have the appealed case, tried on the merits, before us. It is pending on our docket as Appeal Cause No. 09–86–190 CR

styled *Thomas Smith Mathes, III v. The State of Texas*, not yet orally submitted.

The brief of the Appellant in the appeal on behalf of Thomas Smith Mathes, III, sets out six "points of error" which are ably briefed and vigorously argued.

In the prayer for relief in Appellant's brief, in the unsubmitted case, he takes the position that because the evidence is insufficient our court should render a judgment of acquittal. In the alternative, because of many trial errors, the brief maintains the Ninth Court *should reverse the judgment and remand the whole cause for new trial. Hence, the judgment in the appealed case is not final*. Thus, the doctrine of collateral estoppel would not and should not apply.

But the court speaks of the next trial involving Mathes *as a capital murder trial*. It is interesting to note that, in the case involving the death of Debra Davis, there were ten large volumes of Statements of Fact just on the voir dire, consisting of 2,686 pages. Query: How will the trial judge try the case against Mathes involving the death of Vandiver? Query: Will it be tried all the way through as a stricly capital murder case with the attendant lengthy time and extraordinary expense involved in the selection of the capital murder jury? Query: How will the court charge the jury? Query: Will it charge the jury on capital murder and ask the first special issue, omitting the second issue? Query: Will the trial court disobey the statute as to the special issues? Query: Or will the court follow the statute all the way through, charging on capital murder, and then, on the punishment phase, follow the statute as the Legislature has dictated and ask both questions even though the majority of this court has granted a habeas corpus writ to the effect that the death penalty cannot be assessed.

In *Padgett v. State*, 717 S.W.2d 55 (Tex. Crim.App.1986) the court set out the following guidelines to test whether a prosecutor is collaterally estopped. The court wrote:

"To determine whether a state is collaterally estopped from relitigating an

issue in a criminal case, the Supreme Court offered the following guidance:

'[A court should] ... examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration [footnote omitted]. The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'"

*Id.* at 57 quoting *Ashe v. Swenson, supra.*

The charge to the jury in No. 18,557 D—the murder of Debra Davis—styled *The State of Texas v. Thomas S. Mathes, III* on the punishment phase of the capital murder case was filed on May 12, 1986, over two years ago. The record reflects that Mathes is in the State Department of Corrections, nothing more.

On May 12, 1986, the jury was presented with Special Issue No. 1 reading:

"Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

"Answer Yes or No."

The unanimous answer was "Yes".

Special Issue No. 2 was:

"Where there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

"Answer Yes or No."

The jury unanimously answered "No". Since the jury was trying the capital murder case involving the killing of Debra Davis and since Special Issue No. 2 speaks of a "probability" as of May 12, 1986, it was natural for the jury to be weighing Mathes' actions in regard to the killing of Debra.

Furthermore, following the tests set out in *Padgett v. State, supra* and *Ashe v. Swenson, supra,* the State would not and should not be estopped from trying Mathes and seeking a capital murder conviction, including the supreme penalty of death.

It is interesting to note that, on Relator's application for habeas corpus, under his pleading concerning collateral estoppel, the Relator, himself, defines collateral estoppel as:

"Collateral estopple [sic] is that principal [sic] of law which means that when an Issue of fact has once been determined by a valid and *final Judgment,* that issue cannot again be litigated between the same parties in any future lawsuit." (emphasis ours)

Relator then agrees that collateral estoppel comes into play only after a valid judgment becomes final. No final judgment has taken place in the capital murder trial involving the killing of Debra Davis. Hence, the doctrine of collateral estoppel cannot be properly and procedurally applied in this original proceeding.

That the sole or only aggravating circumstances found by a state court jury, at the sentencing phase of the trial, was also identical to an element of a capital murder conviction does not violate the federal constitution. *Lowenfield v. Phelps,* 484 U.S. ——, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

The Court has before it the Statement of Facts and the Transcript of the trial in Cause No. 09–86–00190–CR for the Court's further examination of the State's evidence as to the different roles played by Appellant in the two deaths. This Statement of Facts contains the evidence in the case involving Debra's death. We have been asked to examine that entire record. There being no objection, I have done so.

I have found no provision in the Texas Code of Criminal Procedure allowing the trial of a capital murder case without submitting both special issues to the jury as dictated by the statute.

Further, in my opinion, the Court's holding is overbroad. I think the Court should limit or restrict its holding based on the understanding that the State's evidence would be virtually identical to the evidence presented in Mathes' first trial. Apparently the State, below, had agreed that the evidence in the second capital murder proceeding would be exactly the same. Con-

sidering the long duration of time that has elapsed since the first trial, I do not understand how the State can realistically enter into such an agreement.

The writ of habeas corpus should not be granted.